# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF MICHIGAN
## SOUTHERN DIVISION

_____

IN RE: AUTOMOTIVE PARTS
ANTITRUST LITIGATION                    MASTER FILE NO. 12-md-02311


_____

In Re: Bearings                         HON. MARIANNE O. BATTANI

_____

THIS DOCUMENT RELATES TO:

Dealership Actions                      2:12-cv-00502
End-Payor Actions                       2:12-cv-00503

_____/

## OPINION AND ORDER GRANTING IN PART AND
## DENYING IN PART DEFENDANTS' COLLECTIVE
## <u>MOTION TO DISMISS INDIRECT PURCHASER ACTIONS</u>

Before the Court is Defendants' Collective Motion to Dismiss End-Payor Plaintiffs'

Consolidated Amended Class Action Complaint (Doc. No. 73 in 12-503), and

Automobile Dealer Plaintiffs' Consolidated Class Complaint (Doc. No. 82 in 12-502).

Defendant movants include JTEKT Corporation, JTEKT North America Corporation,

Nachi-Fujikoshi Corporation, Nachi America Inc., NTN Corporation, NTN USA

Corporation, NSK Ltd., NSK Americas, Inc., Schaeffler AG, Schaeffler Group USA Inc.,

and AB SKF.  SKF USA, Inc. joined the motion.

On August 21, 2013, Automobile Dealer Purchaser Plaintiffs filed their

Consolidated Class Action Complaint, (Doc. No. 67 in 12-502), and on October 23,

2013, End-Payor Plaintiffs filed their Corrected Consolidated Amended Class Action Complaint (Doc. No. 70 in 12-503).  In their motion, Defendants challenge the sufficiency of the allegations of conspiracy to fix prices on Bearing products filed by two different groups of plaintiffs–automobile dealers and end-payors.

## I. INTRODUCTION

Automobile Dealer Plaintiffs and End-Payor Plaintiffs (collectively "Indirect Purchaser Plaintiffs" or "IPPs") bring class actions against Defendants under federal and state law based on Defendants' alleged conspiracy to  fix prices and allocate the market for automotive Bearings. Defendants manufacturer or sell Bearings in the United States.  The Automobile Dealer Plaintiffs ("ADPs"), including Martens Cars of Washington, Inc., Landers Auto Group No. 1, Inc. d/b/a Landers Toyota, Hammett Motor Company, Inc., Superstore Automotive, Inc., Lee Pontiac-Oldsmobile-GMC Truck, Inc., Westfield Dodge City, Inc., V.I.P. Motor Cars Ltd., Desert European Motorcars, Ltd., Landers McLarty Fayetteville TN, LLC, Dale Martens Nissan Subaru, Inc., Green Team of Clay Center Inc., McGrath Automotive Group, Inc., Table Rock Automotive, Inc. d/b/a Todd Archer Hyundai, Archer-Perdue, Inc. d/b/a Archer-Perdue Suzuki, Landers McLarty Lee's Summit, Mo. LLC d/b/a Lee's Summit Chrysler Dodge Jeep Ram, and d/b/a Lee's Summit Nissan, Bonneville and Son, Inc., Holzhauer Auto and Truck Sales, Inc., Pitre, Inc. d/b/a Pitre Buick GMC, Patsy Lou Chevrolet, Inc., John Greene Chrysler Dodge Jeep, LLC, SLT Group II, Inc. d/b/a Planet Nissan Subaru of Flagstaff, Herb Hallman Chevrolet, Inc. d/b/a Champion Chevrolet, Charles Daher's Commonwealth Motors, Inc. d/b/a Commonwealth Chevrolet, Commonwealth Kia, Commonwealth Honda, Commonwealth Nissan, Inc. d/b/a Commonwealth Nissan,

Ramey Motors, Inc., Thornhill Superstore, Inc. d/b/a Thornhill GM Superstore, Dave

Heather Corporation d/b/a Lakeland Toyota Honda Mazda Subaru, Central Salt Lake

Valley GMC Enterprises, LLC d/b/a Salt Lake Valley Buick GMC, Capitol Chevrolet

Cadillac, Inc., Capitol Dealerships, Inc. d/b/a Capitol Toyota, Beck Motors, Inc.,

Stranger Investments d/b/a Stephen Wade Toyota, John O' Neil Johnson Toyota, LLC,

Hartley Buick GMC Truck, Inc., Lee Oldsmobile-Cadillac, Inc. d/b/a Lee Honda, Lee

Auto Malls-Topsham, Inc. d/b/a Lee Toyota of Topsham, Landers of Hazelwood, LLC

d/b/a Landers Toyota of Hazelwood, Cannon Chevrolet-Oldsmobile-Cadillac-Nissan,

Inc., Cannon Nissan of Jackson, LLC, Hudson Charleston Acquisition, LLC d/b/a

Hudson Nissan, Shearer Automotive Enterprises III, Inc., and Apex Motor Corporation

"filed their Consolidated Class Complaint on behalf of themselves and all others

similarly situated."  (Doc. No. 67 in 12-502).  In their proposed class action, Automobile

Dealer Plaintiffs allege that "manufacturers and suppliers of automotive bearings,

globally and in the United States" engaged in "a lengthy conspiracy to suppress and

eliminate competition in the bearings industry by agreeing to fix, stabilize, and maintain

the prices of these products. . . ."  (Doc. No. 67 in 12-502, Ex. 1 ¶ 1).

        In their Corrected Consolidated Amended Class Action Complaint (Doc. No. 70 in

12-503), End-Payor Plaintiffs ("EPPs") Rebecca Lynn Morrow, Erica J. Shoaf, Tom

Halverson, Sophie O'Keefe-Zelman, Stephanie Petras, Melissa Barron, John W.

Hollingsworth,, Meetesh Shah, Michael J. Tracy, Jane Taylor, Keith Uehara, Jennifer

Chase, Darrel Senior, James E. Marean, Ron Blau, Roger D. Olson, Nilsa Mercado,

Darcy c. Sherman, David Bernstein, Ellis Winston McInnis, IV,  Thomas N. Wilson,

Lauren C. Primos, Robert P. Klingler, Jessica DeCastro, Lori Curtis, Virginia Pueringer,

Nathan Croom, Richard Stoehr, Edward T. Muscara, Michael Wick, Tenisha Burgos, Jason Grala, Kathleen A. Tawney, Kelly Klosterman, Kent Busek, Cindy Prince, Paul Gustafson, France H. Gammell-Roach, William Dale Picotte, Phillip G. Young, Jesse Powell, Alena Farrell, Jane FitzGerald, Arthur Stukey, Hanne Rice, Robert M. Rice, Jr., Stacey R. Nickell, and Carol Ann Kashishian, on behalf of themselves and all others similarly situated, "bring a class action against Defendants, suppliers of Automotive Bearings. . .globally and in the United States, for engaging in a massive conspiracy to unlawfully fix and artificially raise the prices" of Bearings."   (Doc. No. 70 in 12-503 at ¶ 1).

In their motion, Defendants challenge the sufficiency of the complaints, asserting that the facts alleged do not support the existence of a global conspiracy by all Defendants over a nine-year period.  Defendants also argue that Indirect Purchaser Plaintiffs lack both antitrust and constitutional standing, and that all state claims must be dismissed for a variety of reasons.

Defendants waived oral argument on the motion, which was scheduled for June 4, 2014.  The Court has reviewed all of the filings, and for the reasons that follow, the motion is **GRANTED in part** and **DENIED in part**.

## II.  SUMMARY OF THE FACTUAL ALLEGATIONS

According to their complaints, Plaintiffs purchased Bearings indirectly from Defendants and their co-conspirators as part of purchasing or leasing a new vehicle or as a replacement when repairing a damaged vehicle.  Automotive Bearings "are used to decrease the rotational friction between a vehicle and the surface" on which it runs, to

"help maintain balance in the event of speed changes or sudden braking," and generally to "allow for smooth driving."   (Doc. No. 67 at ¶ 149; Doc. No. 70 at ¶ 102).   Indirect Purchaser Plaintiffs identify several groups of Defendants:  the JTEKT group (Doc. No. 67 at ¶¶ 111-115; Doc. No. 70 at ¶¶ 69-72), which includes JTEKT Corporation and Koyo Corporation of U.S.A.; the Nachi group, which includes Nachi-Fujikoshi Corporation and Nachi America Inc.,  (Doc. No. 67 at ¶¶ 117-120; Doc. No. 70 at ¶¶ 73-77); NSK group, which includes NSK Ltd., and NSK Americas, Inc. (Doc. No. 67 at ¶¶ 121-126; Doc. No. 70 at ¶¶ 78-83); Schaeffler group, which includes Schaeffler AG and Schaeffler Group USA Inc., (Doc. No. 67 at ¶¶ 127-132; Doc. No. 70 at ¶¶ 84-89); SKF Defendants, which includes AB SKF and SKF USA, Inc. (Doc. No. 67 at ¶¶ 133-139; Doc. No. 70 at ¶¶ 90-94); and NTN group, which includes NTN Corporation and NTN USA Corporation (Doc. No. 67 at ¶¶ 140-45; Doc. No. 70 at ¶¶ 95-98).

IPPs include allegations about Defendants' size and global sales, conditions in the market that are conducive to antitrust conspiratorial conduct, the numerous opportunities to conspire presented by industry trade shows, industry organizations, and through buying and selling Bearings with competitors.  "The U.S. market size for Automotive Bearings was $2.71 billion in 2008." (Doc No. 67 at ¶ 162; Doc. No. 70 at ¶ 107). According to IPPs, a small number of manufacturers, including Defendants, dominate the Automotive Bearings market.  (See e.g. Doc. No. 70 at ¶ 108).   The top three suppliers control nearly 75 percent of the U.S. market.  (Doc. No. 70 at ¶ 123). Nachi provides bearings for "60% of all passenger automobiles and light trucks on the road." (Doc. No. 67 at ¶ 153).  Schaeffler supplies bearings to "nearly all automotive manufacturers," including "Volkswagen, Fiat, Jaguar, Land Rover, Porsche, Toyota,

BMW, Mercedes, Daimler Chrysler, GM and Ford." (Doc. No. 67 at ¶ 154). NSK's main customers include Honda, Mitsubishi, Nissan, and Toyota, (Doc. No. 67 at ¶ 155), and SKF's lists "Alfa Romeo, Chrysler, Ferrari, Volvo, BMW, Jaguar, Kia, Nissan, Porsche, Saab, Volkswagen, Mercedes, Ford, General Motors, Audi, Honda, Mazda, Hyundai, and Toyota" as main customers. (Doc. No. 67 at ¶ 156). As evidence of the conspiracy, IPPs observe that Bearings prices increased even as demand decreased during the Class Period. (Doc. No. 67 at ¶¶ 164-165).

IPPs allege that the market structure is conducive to price fixing and market allocation. There are significant barriers to entry in the market for Bearings. For example start-up costs are high in light of the costs associated with manufacturing plants and equipment, energy, transportation, distribution infrastructure, and skilled labor. (Doc. No. 67 at ¶¶ 167-168). Moreover, Defendants own patents for Bearings. (Doc. No. 67 at ¶ 170). In addition, demand is inelastic. (Doc. No. 67 at ¶¶ 171-73). The market is highly concentrated; the top three suppliers control nearly 75 percent of the market in the United States. (Doc. No. 67 at ¶ 174).

IPPs further allege that Defendants and their co-conspirators had opportunities to conspire. For example, Defendants can meet privately at trade shows. (Doc. No. 67 at ¶ 175). Six Defendants--NSK, NTN, Schaeffler, Nachi-Fujikoshi, Koyo, and SKF--make up the bulk of the seven member World Bearing Association ("WBA"). (Id. at ¶ 176). Trade meetings are not the only opportunities to conspire alleged in the CACAC. DPPs allege that distributers organized golf outings attended by Defendants' employees, who were paired at the various events. (Doc. No. 67 at ¶¶ 177-78). Defendants and their co-conspirators had the opportunity, through these events, to "engage in private

6

meetings, conversations and communications to discuss pricing and customer allocation for Bearings sold in the United States." (Doc. No. 67 at ¶ 178). In addition, Defendants had opportunities to trade information because of the numerous acquisitions in the Bearings industry over the past five years. (Doc. No. 67 at ¶ 179). Because Defendants and their co-conspirators routinely produced and sold Bearings to each other, senior level employees "would meet or communicate to discuss and finalize these arrangements, thereby creating "additional opportunities for Defendants to collude on customer allocation and pricing structures in the U.S. Bearings market." (Doc. No. 67 at ¶ 180).

Finally, IPPs advance allegations about the investigations in the United States and other jurisdictions. The United States, Canada, Japan, Europe, Australia, Singapore, and Korea coordinated global antitrust investigations into industrial and automotive Bearings. (Doc. No. 67 at ¶ 181). The DOJ is investigating NTN, Schaeffler, and NSK. (Doc. No 67 at ¶¶ 182-85). On-site inspections have taken place in Korea, and the Australia Competition and Consumer Commission instituted civil proceedings against a sister company of Defendant Koyo for cartel conduct relating to the supply of ball and roller bearings. (Doc. No. 67 at ¶ 203).

After JTEKT sought and received leniency from the Japan Fair Trade Commission ("JFTC"), JTEKT admitted its participation in the cartel and cooperated with the JFTC investigation. (Doc. No. 67 at ¶ 186). In July 2011, the JFTC inspected facilities of NSK, NTN, JTEKT, and Nachi-Fujikoshi for evidence of violations of the antimonopoly law. (Doc. No. 67 at ¶ 187). NTN and NSK confirmed the inspections in annual reports. (Doc. No. 67 at ¶¶ 188-89). JTEKT confirmed its inspection with a

7

press release on its website.  (Doc. No. 67 at ¶ 190).

In addition to the allegations regarding investigations of Defendants in other jurisdiction, IPPs requested, and the Court took judicial notice of guilty pleas of two Defendants in the United States.  (Doc. No. 88 in 12-502; Doc. No. 101 in 12-503). JTEKT Corporation pleaded guilty to conspiring to fix prices, rig bids, and allocate markets with respect to Bearings from as early as 2000 to at least July 2011, and JTEKT paid a $102.37 million fine.  NSK, Ltd. likewise pleaded guilty to a conspiracy to fix prices for Bearings from 2000 until at least 2011, and agreed to pay a $68.2 million fine.

Based on these allegations, IPPs advance state law antitrust, consumer protection, and unjust enrichment claims.  In their motion to dismiss the complaints in their entirety, Defendants challenge the sufficiency of the complaints, standing, and whether the Indirect Purchaser Plaintiffs can bring claims under the antitrust laws, the consumer protection laws, and the unjust enrichment laws of various states.

## III.  STANDARD OF REVIEW

Federal Rule of Civil Procedure 12(b)(6) allows district courts to dismiss a complaint when it fails "to state a claim upon which relief can be granted."  When reviewing a motion to dismiss, the Court "must construe the complaint in the light most favorable to the plaintiff, accept all factual allegations as true, and determine whether the complaint contains enough facts to state a claim to relief that is plausible on its face."  Bell Atl. Corp. v. Twombly, 550 U.S. 544, 570 (2007).  Although the federal procedural rules do not require that the facts alleged in the complaint be detailed, "'a

8

plaintiff's obligation to provide the 'grounds' of his 'entitlement to relief' requires more than labels and conclusions, and a formulaic recitation of a cause of action's elements will not do.'" Twombly, 550 U.S. at 555; Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009) ("Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice."). Under Iqbal, a civil complaint will only survive a motion to dismiss if it "contain[s] sufficient factual matter, accepted as true, to state a claim for relief that is plausible on its face. . . . Exactly how implausible is 'implausible' remains to be seen, as such a malleable standard will have to be worked out in practice." Courie v. Alcoa Wheel & Forged Prods., 577 F.3d 625, 629-630 (6th Cir. 2009).

## IV.  ANALYSIS

### A.  Procedural Background

When the United States Judicial Panel on Multidistrict Litigation ("Judicial Panel" or "Panel")  transferred actions sharing "factual questions arising out of an alleged conspiracy to inflate, fix, raise, maintain, or artificially stabilize prices of automotive wire harness systems" to the Eastern District of Michigan, (12-md-02311, Doc. No. 2), in February 2012, it is unlikely that the the scope and extent of antitrust conspiratorial conduct in the automotive component parts industry was on the radar.  Even after the Judicial Panel expanded MDL No. 2311 in June 2012 to include alleged conspiracies to fix the prices of three additional component it is unlikely that the Panel could foresee the inclusion of twenty-five additional component part cases.  Although the Judicial Panel predicted centralizing litigation in this District would eliminate duplicative discovery,

9

prevent inconsistent pretrial rulings, and conserve resources, the Court finds that conserving the Court's resources requires a more streamlined approach in resolving collective motions to dismiss.  The Court already has addressed these arguments because the defendants in the four component part cases advanced many of the same arguments and relied on much of the same authority albeit in differing factual backdrops.

Accordingly, those arguments raised in this motion that have been addressed in the Court's prior rulings on motions to dismiss other component part complaints by indirect purchasers, will not be addressed in this opinion.

### B.  Sufficiency of the Antitrust Allegations

Defendants characterize the complaints as advancing legal conclusions unsupported by factual allegations as required by Iqbal, 566 U.S. at 679.  The Court disagrees.  Defendants' efforts to distinguish the allegations regarding this conspiracy from those deemed sufficient in prior component parts are not persuasive.

Subsequent to a wide-ranging investigation by governmental authorities into a conspiracy involving automotive parts, JTEKT Corporation and NSK Ltd. pleaded guilty to participating in a conspiracy to fix prices and rig bids of Bearings in the United States. Moreover, admissions and findings of participation in a conspiracy to fix the prices of bearings is not limited to the United States.  Defendants NTN, NSK, and Nachi-Fujikoshi were fined by the JFTC a total of $142 million for collusive conduct.  Although the JFTC did not fine JTEKT because it revealed the conspiracy to the FJTC, (Doc. No. 67 at ¶¶ 9-10; Doc. No. 70 at ¶¶ 125-137), JTEKT was fined $5 million in Canada for

10

participating in a bearings conspiracy.  (Doc. No. 67 at ¶¶ 14, 210-11; Doc. No. 70 at ¶¶ 153-55).  In addition, JTEKT's subsidiary was fined for price-fixing bearings from 2000 to 2011 by the Australian Competition and Consumer Commission.  In addition to the factual allegations regarding these Defendants, IPPs allege that a leniency applicant under the Antitrust Criminal Penalty Enhancement and Reform Act is likely in this case, given the length and nature of the conspiracy.  (Doc. No. 67 at ¶¶ 214-15; Doc. No. 70 at ¶ 168).  A conspirator that is accepted into the leniency program is not charged with a criminal offense and is not required to plead guilty.

These allegations about the investigations and the guilty pleas are not the only basis upon which to assess the sufficiency of the complaints.  The Court is mindful of the market conditions conducive to antitrust conspiratorial conduct.  See Watson Carpet & Floor Covering, Inc. v. Mohawk Indus., Inc., 648 F.3d 452, 454-55 (6th Cir. 2011) (observing that when "a complaint specifically alleges an express agreement to restrain trade and conduct by defendants consistent with the agreement, a defendant cannot prevail at the pleading stage by offering alternative explanations for the allegedly unlawful behavior").  Based on the guilty pleas, an inference arises that not only were the market conditions alleged to be conducive to the birth of an antitrust conspiracy, the conditions allowed an antitrust conspiracy to flourish for eleven years.  See e.g. In re Packaged Ice Antitrust Litig., 723 F. Supp. 2d at 1014 ("oligarchic sellers" and "prohibitive entry barriers" conducive to collusion).  These are the types of allegations deemed sufficient in Standard Iron Works v. ArcelorMittal, 639 F. Supp. 2d 877, 883 (N.D. Ill. 2009).  In that case, the plaintiffs alleged that the steel market in the United

States was conducive to an antitrust conspiracy given "significant barriers to entry, including high capital requirements and regulatory barriers." Id.  The plaintiffs also alleged that restrains in place on imported steel, including transportation costs, "trade duties, and currency exchange rates" protected domestic producers from foreign competition and allowed the domestic producers to raise prices. Id.  Likewise, in this case, the market conditions support an inference that the conspiracy encompassed entities beyond those pleading guilty and beyond their admitted targets.

Lastly, the Court recognizes that the Bearings investigation grew out of a broader investigation into the auto parts industry generally, an industry rife with price-fixing. Many of the companies pleading guilty to bid-rigging, price-fixing, and market allocation of automotive parts during this same time frame had multiple OEMS as targets. Therefore, even though the United States guilty pleas do not include admissions that multiple OEMs were targeted, the Court finds that all of the conduct by various defendants named in MDL 2311 is relevant to support the existence of the Bearings conspiracy.  See e.g. In re Flash Memory Antitrust Litig., 643 F. Supp. 2d 1133, 1149 (N.D. Cal. 2009) (addressing how an earlier conspiracy might create an inference strengthening the existence of a latter conspiracy).  Notably, in United States v. Andreas, 216 F.3d 645 (7th Cir. 2000), the appellate court acknowledged that "evidence concerning a prior conspiracy may be relevant and admissible to show the background and development of a current conspiracy."  In re Flash Memory, 643 F. Supp. 2d at 1149.  Here, the component parts in the MDL involve allegations of a similar scheme in each part, and thus, provide context as to how the. . .conspiracy operated.  Andreas.

12

216 F.3d  at 665; see also High Fructose, 295 F.3d at 661 (same); In re Static Random

Access Memory (SRAM) Antitrust Litig., 580 F. Supp. 2d 896, 903 (N.D. Cal. 2008)

(recognizing that guilty pleas in the earlier litigation did not support the existence of the

second conspiracy on their own, but finding the guilty pleas did "support an inference of

a conspiracy in the related industry").  The allegations here are easily distinguished from

those deemed inadequate in In re Elevator Antitrust Litig., 502 F.3d 47, 52 (2d Cir.

2007) (no guilty pleas in the United States) because two Defendants have pleaded

guilty to engaging in antitrust conduct in the United States.  Those Defendants also

were involved in antitrust conduct abroad.

     In assessing the complaints as a whole, the Court finds that they allege an

express agreement existed to fix prices and allocate customers in a market with

conditions ripe for conspiratorial conduct.  The factual allegations create "a reasonable

expectation that discovery will reveal evidence of illegal agreement" beyond those

parties that have pleaded guilty and beyond the extent admitted by JTEKT Corporation

and NSK Ltd.  Twombly, 550 U.S. at 556. Accord In re Polyurethane Foam Antitrust

Litig., 799 F. Supp. 2d 777, 782 (N.D. Ohio 2011) (relying on "specific admissions"

made during a governmental investigation that supported the "existence of a

conspiratorial agreement" as opposed to government investigations coupled with

parallel conduct).   Despite Defendants' characterization to the contrary, these

complaints bear no resemblance to the typical complaint found lacking under Twombly.

See Starr v. Sony BMG Music Entm't, 592 F.3d 314, 324 (2d Cir. 2010) (observing that

courts dismissed complaints alleging generic conduct or complaints advancing only

13

legal conclusions).  Accord Standard Iron Works, 639 F.Supp. 2d at 883.

Accordingly, the Court denies Defendants' request to dismiss the complaints based upon the sufficiency of the allegations and considers Defendants' argument that constitutional standing is lacking.

### C.  Standing

The parties dispute whether IPPs have satisfied the constitutional requirement for standing; specifically, whether each plaintiff alleged a "personal injury fairly traceable to the defendant's allegedly unlawful conduct" that is "likely to be redressed by the requested relief."  Allen v. Wright, 268 U.S. 747, 751 (1984).   Defendants assert that the standing requirement is not satisfied under any state law invoked by IPPs because IPPs have not alleged facts to establish that they suffered an injury-in-fact and that IPPs lack standing to proceed in states where no plaintiff resides.   The Court had addressed these arguments in other component part cases and finds no grounds for reaching a different conclusion on the sufficiency of the allegations.   The Court's reasoning is summarized below.

### 1.  Injury-in-fact

To demonstrate Article III standing, a plaintiff must first allege that he has suffered an injury that is (a) concrete and particularized and (b) actual or imminent, rather than conjectural or hypothetical.  Lujan v. Defenders of Wildlife, 504 U.S. 555, 560 (1992).  Second, the alleged injury must be fairly traceable to the defendant's conduct, and not the result of the independent action of a third party.  Id.  Third, the plaintiff must allege that a favorable federal court decision is likely to redress the alleged

injury.  Id. at 561.

Because ADPs and EPPs are indirect purchasers, their complaints must include

two allegations: (1)  Defendants overcharged the direct purchasers; and (2) some or all

of the overcharge was passed on to them through each of the various intermediate

levels of the distribution chain.  See In re Graphics Processing Units Antitrust Litig., 253

F.R.D. 478, 502 (N.D. Cal. 2008) ("In re GPU") (observing that "indirect purchasers

must prove that an overcharge was levied on direct purchaser of the defendants'

products, who then passed all or some of that overcharge through to the indirect

purchasers"); D.R. Constr., Co. v. Rohm & Haas Co., 470 F. Supp. 2d 485, 492-93

(E.D. Pa. 2006) (finding that the plaintiffs' allegations "that they paid inflated prices for

products with plastics additives due to an overcharge on plastics additives which was

passed on to them from the intervening links within the distribution chain, that plaintiffs'

overpayment for products containing plastics additives was caused by the conspiracy

among defendants to charge inflated prices for plastics additives, and that judicial relief

will compensate plaintiffs for these injuries, restoring plaintiffs to the position they were

in prior to the price-fixing scheme" satisfied standing).

The allegations in the complaints satisfy IPPs' pleading burden.  EPPs have

alleged that they have purchased indirectly from one or more of Defendants during the

Class Period.  (Doc. No. 70 at ¶¶ 9, 174, 179, 183, 201, 214, 216, 218).   ADPs have

alleged the brands of vehicles they sell, and each is manufactured by an OEM supplied

by one or more of the Defendants.  (Doc. No. 67 at ¶¶ 15, 233, 266-67, 245, 281, 283,

284).  The same is true of replacement Bearings.  Each Complaint details how Bearings

follow a traceable path through the distribution chain and that overcharges for Bearings

were passed through that distribution chain from OEMs to Auto Dealers and End-Payors.  (Doc. No. 67 at ¶¶ 232-235, 237-245; Doc. No. 70 at ¶¶ 179-183). They allege a physical chain of distribution from Defendants to Plaintiffs and that the costs are traceable.  (Doc. No. 67 at ¶ 236; Doc. No. 70 at ¶ 182).

IPPs have alleged that Defendants caused them economic injury because the overcharges affected the price of vehicles containing Bearings as well as stand-alone Bearings purchased as replacement parts.  Consequently, there is a reasonable inference here that Defendants' anticompetitive conduct harmed businesses and impacted the prices that consumers paid for new vehicles.   The Court is not persuaded that the allegations are too remote or contrary based upon Defendants' position that the price-fixed product does not make up a substantial portion of the finished good's costs.

 In sum, the Court finds IPPs have met their pleading burden.  See In re Processed Egg Prod. Antitrust Litig., 851 F. Supp. 2d 867, 887 n.15 (E.D. Pa. 2012) (addressing the indirect purchaser plaintiffs' allegation that they paid supracompetitive prices for shell eggs and egg products); Fond du Lac Bumper Exch., Inc. v. Jui Li Enter. Co., 09-CV-00852 2012 WL 3841397 at *4 (E.D. Wis. Sept. 5, 2012) (indirect purchasers alleging they are participants in the AM parts market, because they are "end users of AM parts, and that they are being injured because the higher prices defendants charge for AM parts are being passed on to end users by direct purchasers and others in the chain of distribution paid inflated prices" satisfied Article III standing requirements).

### 2.  Residency

Next, the parties disagree as to whether Indirect Purchaser Plaintiffs have standing to pursue claims in states where they do not reside.  According to Defendants, no Automobile Dealer Plaintiff resides in or, consequently, suffered an injury in North Dakota; no End-Payor Plaintiff resides in or suffered injury in the District of Columbia. In the previous opinions addressing this argument by indirect purchasers, the Court distinguished the authority relied upon by Defendants and deemed it unpersuasive. See e.g. In re Refrigerant Compressors Antitrust Litigation, No. 09-md-02042, 2012 WL 2917365 (E.D. Mich. July 17, 2012) (holding that the antitrust class action plaintiffs had no standing to sue in states where no would-be representative of the plaintiff class lived or allegedly was injured) (citing In re Packaged Ice Antitrust Litig., 779 F. Supp. 2d 657 (E.D. Mich. 2011)).

North Dakota does not require in-state residency to state a claim, and there is no definitive legal authority as to whether the District of Columbia statutes require residency.  See In re Processed Egg Products, 851 F. Supp. 2d at 889-891. Consequently, the Court denies their motion to dismiss these claims on the basis of lack of residency.  Further, as this Court recognized in prior decisions in MDL 2311, even though standing generally is determined at the outset of a case, see Cent. States Se. & Sw. Areas Health & Welfare Fund v. Merck-Medco Managed Care, LLC, 433 F.3d 181, 197-98 (2d Cir. 2005), exceptions exist.  See Ortiz v. Fibreboard Corp., 527 U.S. 815, 831 (1999); Amchem Prod., Inc. v. Windsor, 521 U.S. 591, 612 (1997) (postponing the standing determination until after a class certification ruling because the certification issues are "logically antecedent to Article III concerns").  The Court recognizes that the

17

Sixth Circuit has not decided the applicability, if any, of <u>Ortiz</u> and <u>Amchem</u> to an indirect purchaser antitrust class action; however, the Sixth Circuit has applied the same rationale to an ERISA class action law suit.  <u>See</u> <u>Fallick v. Nationwide Ins. Mut. Co.</u>, 162 F.3d 410 (6th Cir. 1998).  This Court finds no basis to alter its previous conclusion that the rationale is persuasive.  Because the Court finds that IPPs have standing to proceed with their state law claims, it considers Defendants' challenge to the viability of the state law claims on other grounds.

### D.  Due Process

Defendants assert that due process requires dismissal of EPPs' state law claims because no named plaintiff has alleged where any purported injury occurred. Defendants are correct that for the law of a state to apply to a particular claim, the state " 'must have a significant contact or significant aggregation of contacts' to the claims asserted by each member of the plaintiff class, contacts 'creating states interests,' in order to ensure that the choice of [a state's] law is not arbitrary or unfair." <u>Phillips Petroleum Co. v. Shutts</u>. 472 U.S. 797, 818-19 (1985) (quoting <u>Allstate Ins. Co. v. Hague</u>, 449 U.S. 302, 312-13 (1981) (plurality opinion)).  Nevertheless, the facts giving rise to the discussion in <u>Shutts</u> set it apart from the facts at hand.  The Supreme Court considered whether the application of Kansas law to a nationwide class action suit brought by gas company investors seeking to recover interest on royalties complied with due process.  In deciding that it did not, the Supreme Court noted that the defendant did not reside in Kansas, 99% of the gas leases involved in the suit lacked a connection to Kansas, as did 97% of the plaintiffs.  In contrast, EPPs' claims are connected to the various state laws under which they proceed because they reside in those states.  EPPs

18

allege that they purchased Bearings for personal use, and they allege they paid artificially inflated prices for Bearings during the Class period. (Doc. No. 70 at ¶¶ 9, 21-68). Accordingly, <u>Shutts</u> does not preclude their claims.

### E. Availability of Relief under State Law

IPPs advance claims based on antitrust, consumer protection, and unjust enrichment laws of various states. Defendants argue for dismisssal based upon the limitations period applicable to each state antitrust, consumer protection, and unjust enrichment claim governing the timeliness of IPPs causes of action. The statutes of limitations range from two to six years. The first indirect purchaser complaint against any Defendant was filed May 23, 2012. Defendants contend that any violation prior to the applicable statute of limitations period is not actionable.

IPPs have alleged that they did not discover their claims or facts sufficient to place them on notice of the claims until July 2011 when announcements of the government investigations into Bearings price-fixing became public. (Doc. No. 67 at ¶¶ 220-228, 247-249; Doc. No. 70 at ¶¶ 186-87, 189, 195). According to IPPs, prior to that time there was no information sufficient to suggest any of Defendants was involved in a criminal conspiracy to price-fix Bearings.

In the alternative, IPPs allege that the doctrine of fraudulent concealment applies. The Court agrees that to the extent that the doctrine is applicable, the complaints here have alleged facts to support the elements. A plaintiff must plead three elements to establish fraudulent concealment:

> (1) wrongful concealment of their actions by the defendants;
> (2) failure of the plaintiff to discover the operative facts that

19

> are the basis of his cause of action within the limitations
> period; and (3) plaintiff's due diligence until discovery of the
> facts.

Dayco Corp. v. Goodyear Tire & Rubber Co., 523 F.2d 389, 394 (6th Cir. 1975).  A

plaintiff must plead the factual allegations underlying a claim of fraudulent concealment

with particularity.  Friedman v. Estate of Presser, 929 F.2d 1151, 1160 (6th Cir. 1991).

IPPs allege that they had no knowledge of the conspiracy until July 2011 because of

Defendants' affirmative concealment.  (Doc. No. 67 at ¶ 267; Doc. No. 70 at ¶ 194).

IPPs also allege that they did not discover the conduct nor were their facts prompting an

inquiry.  Notably, the allegations found to be sufficient for wrongful concealment in

Carrier Corp. v. Outokumpu Oyj, 673 F.3d 430, 446-47 (6th Cir. 2012), were not

extensive.  In that case, the  plaintiffs relied on findings from the European Commission

that conspirators "established security rules to prevent a paper trail. . .and used a

coding-system to hide the identity of the producers in their documents and

spreadsheets."  Id. at 447.  These allegations satisfied the Sixth Circuit, inasmuch as

they demonstrated "active steps to hide evidence, as opposed to simply meeting in

secret."  Id. at 447 (citing Bridgeport Music, Inc. v. Diamond Time, Ltd., 371 F.3d 883,

891 (6th Cir. 2004) (explaining that "hiding evidence" can constitute affirmative

concealment)).

The Court found similar allegations sufficient to demonstrate wrongful

concealment in other component part cases, see e.g. In re Auto. Parts Antitrust Litig.,

12-MD-02311, 2013 WL 2456584 (E.D. Mich. June 6, 2013), and Defendants have not

provided grounds for distinguishing the situation here from the decision in those cases.

20

Accordingly, the Court denies Defendants' request to dismiss on statute of limitations grounds.

### 1. Antitrust Claims

Indirect Purchaser Dealer Plaintiffs advance state antitrust claims under the laws of Arizona, California, Hawaii, Illinois, Iowa, Kansas, Maine, Michigan, Minnesota, Mississippi, Nebraska, Nevada, New Hampshire, New Mexico, New York, North Carolina, North Dakota, Oregon, South Dakota, Tennessee, Utah, Vermont, West Virginia, Wisconsin, and the District of Columbia. Defendants raise several grounds for dismissal, including, standing for component parts purchasers, the sufficiency of the nexus between conduct and interstate commerce, and availability of class action antitrust claims.

### a. Antitrust Standing for Component Parts Purchasers

In  response to the prohibition against antitrust actions by indirect purchasers set forth by the Supreme Court in Illinois Brick Co. v. Illinois, 431 U.S. 720 (1977), many states enacted repealer provisions, allowing state actions for indirect purchasers. In California v. ARC Am. Corp., 490 U.S. 93, 105-06 (1989), the Supreme Court held that federal law does not preempt state indirect purchaser statutes.

Nevertheless, courts are required to determine whether a particular plaintiff is a proper party to bring a private antitrust action. NicSand, Inc. v. 3M Co., 507 F.3d 442, 450 (6th Cir. 2007) (observing that antitrust claimant must show more than mere "injury causally linked" to a competitive practice).   In its decision in Associated Gen. Contractors of Cal., Inc. v. Cal. State Council of Carpenters, 459 U.S. 519, 535 (1983)

21

("AGC"), the Supreme Court interpreted the Clayton Act provision permitting recovery by "any person who shall be injured in his business or property by reason of anything forbidden in the antitrust laws."  The Court concluded that even when a plaintiff plausibly alleges an injury-in-fact sufficient for constitutional standing, the plaintiff still must establish antitrust standing.  "It is reasonable to assume that Congress did not intend to allow every person tangentially affected by an antitrust violation to maintain an action to recover threefold damages for the injury to his business or property."  Id. (quoting Blue Shield of Virginia, Inc. v. McCready, 457 U.S. 465, 477 (1982)).

In AGC, the Supreme Court articulated a number of factors that courts should consider in analyzing the relationship between a plaintiff's harm and a defendant's wrongdoing:  (1) the causal connection between the violation and the harm, and whether the harm was intended; (2) the nature of injury and whether it was one Congress sought to redress; (3) the directness of the injury, and whether damages are speculative; (4) the risk of duplicate recovery or complexity of apportioning damage; and (5) the existence of more direct victims.  AGC, 459 U.S. at 537-45.  A plaintiff need not prevail on every factor; instead, the courts balance the factors, "giving great weight to the nature of the plaintiff's alleged injury."  Id.

This Court concluded in the prior component part cases that the issue of applicability of AGC is one that is governed by state law because this Court is sitting in diversity.  Erie R.R. v. Tompkins, 304 U.S. 64 (1938).  Defendants contend that the antitrust laws of twenty-five jurisdictions invoked by IPPs either apply the ACG factors, look to federal law to interpret their state statutes, or apply a similar remoteness analysis to state antitrust clams.  Nevertheless, the Court finds that the AGC factors do

22

not undermine standing.  Because there is no material distinction between the allegations made in the prior component part cases and those allegations made relative to Bearings, the Court finds no reason to alter the conclusion it reached in resolving this issue in previous parts.  Notably, the Court finds the first factor, whether IPPs suffered an antitrust injury, satisfied because even though IPPs may not be direct participants in the Bearings market, they purchased vehicles containing Bearings or as replacement parts.  See In re TFT-LCD (Flat Panel) Antitrust Litig., 586 F. Supp. 2d 1109, 1121 (N.D. Ca. 2008) ("In re Flat Panel") (citing D.R. Ward Constr. Co. v. Rohm & Haas Co., 470 F. Supp. 2d 485, 491 (E.D. Pa. 2006) (finding standing where "plaintiffs allege that they paid an inflated price for plastics additives due to [the] defendants' price-fixing agreement, thereby implying that the direct harm of the price-fixing conspiracy was passed through the stream of commerce to them, purchasers of products containing plastics additives")).  Here, as was the case in In re (Flat Panel), 586 F. Supp. 2d at 1123, IPPs have advanced allegations that the markets are inextricably linked and intertwined. (Doc. No. 55 at ¶ 203; Doc. No. 58 at ¶ 139).

Specifically, IPPs have alleged that the markets for Bearings and cars are inextricably intertwined, that the demand for cars creates the demand for Bearings, that the Bearings market exists to serve the vehicle market and bearings have little to no value outside the vehicle.  (Doc. No. 67 at ¶ 235; Doc. No. 70 at ¶ 181). The Bearings in this lawsuit only have one use–inserted into vehicles.  (Doc. No. 67 at ¶ 40; Doc. No. 70 at ¶ 181).  In addition Bearings remain identifiable, discrete physical products, unchanged by the manufacturing process or incorporation into vehicles, follow a traceable physical chain, and have their own part numbers that allow tracking through

23

the chain of distribution. (See Doc. No. 67 at ¶¶ 236-238). Bearings can be replaced. (Doc. No. 67 at ¶ 240). Although IPPs concede that Bearings are incorporated into other types of machinery, (Doc. No. 67 at ¶ 162; Doc. No. 70 at ¶ 107), these allegations meet IPPs' pleading burden to show the harm in the market results from Defendants' antitrust violations. The Court's conclusion is not altered by IPPs' status relative to market participation. Standing under antitrust law can be established even where the market participant test is blurry. D.R. Ward Constr. Co., 470 F. Supp. 2d at 502-502; In re Flat Panel, 586 F. Supp. 2d at 1123.

Likewise, the directness of the injury factor is satisfied here, and the Court rejects Defendants' assertion that the distribution chain is so complex and the factors affecting prices paid by IPPs too numerous to satisfy the pleading requirements. Because IPPs asserted that "the cost of the component was traceable through the product distribution chain," they have alleged a chain of causation (See Doc. No. 67 at ¶¶ 103-106; Doc. No. 70 at ¶ 216). Therefore, according to IPPs, they can trace overcharges through the distribution chain, and this AGC factor is satisfied. In re Flash Memory Antitrust Litig., 643 F. Supp. 2d 1133, 1155 (N.D. Cal. 2009).

Similarly, the harm alleged becomes less speculative in light of IPPs' assertion that the component parts remain separate and traceable. In re Flash Memory Antitrust Litig., 643 F. Supp. 2d at 1155 (citation omitted); In re Graphics Processing Units Antitrust Litig., 540 F. Supp. 2d 1085, 1098 (N.D. Calif. Nov. 7, 207) (In re GPU II). In addition, IPPs advance allegations as to how to measure the harm. (Doc. No. 67 at ¶¶ 243-44).

24

Lastly, the Court finds that the existence of three classes does not render the IPPs' claims ripe for duplicative recovery.  Here, IPPs have indicated that the alleged overcharges are distinct and traceable.  Other courts have recognized that such allegations lessen the risk of duplicative recovery.  See  In re Flash Memory, 643 F. Supp. 2d at 1156 (citing In re Flat Panel, 586 F.Supp.2d at 1124; In re GPU II, 540 F. Supp. 2d at 1098).

In sum, the Court is satisfied that the AGC factors do not undermine standing. Therefore, the Court declines to dismiss the claims brought under the laws of Arizona, California, District of Columbia, Hawaii, Illinois, Iowa, Kansas, Maine, Michigan, Mississippi, Nebraska, Nevada, New Hampshire, New Mexico, New York, North Carolina, north Dakota, Oregon, South Dakota, Tennessee, Utah, Vermont, West Virginia, or Wisconsin on this basis.

In addition, Defendants ask the Court to find antitrust claims brought under the laws of New Hampshire and Utah are barred because the conduct at issue occurred before the Illinois Brick repealer statutes were enacted.  Specifically, Utah enacted its statute in 2006, and New Hampshire enacted its indirect purchaser statute in 2008. According to Defendants, the statutes either expressly apply prospectively or the state courts have refused to apply the statutes retroactively.  The Court previously held that even if the date of enactment limits damages, it does not preclude any claim alleged here in its entirety.  Accordingly, the Court finds that Utah Code Ann. § 76-10-918m, which took effect on May 1, 2006, limits IPPs' antitrust claim to price-fixing that occurred after the 2006 amendment.  Likewise, N.H. Rev. Stat. Ann. § 356:11 bars recovery for claims brought under the law of New Hampshire for conduct that occurred prior to

25

January 1, 2008.

### b. Sufficiency of the Nexus Between Conduct and Intrastate Commerce

The parties are in agreement that the antitrust statutes of certain jurisdictions require a plaintiff to allege a nexus between a defendant's conduct and intrastate commerce; boilerplate allegations are insufficient. The parties disagree as to whether the allegations in the complaints satisfy the pleading requirements. Those jurisdictions at issue include the District of Columbia, Mississippi, Nevada, New York, South Dakota, Tennessee, and West Virginia.

In general, Defendants challenge the nexus in the EPPs' complaint based upon EPPs' failure to allege either that they were residents of the identified states and District of Columbia or that they purchased Bearings in those states where they resided. The Court rejects Defendants' argument. Even if EPPs failed to allege that their purchases occurred in the jurisdictions in which they resided, the Court finds the pleadings create a reasonable inference that the purchases occurred where the individual plaintiffs reside. EPPs' complaint, read in the light most favorable to their claims, warrants the inference even given the length of the alleged conspiracy and the increased burden created in purchasing vehicles in jurisdictions outside of a plaintiff's resident state. Finally, EPPs allege that they were injured in the states in which they resided by Defendants' conspiratorial conduct because they were forced to pay inflated prices.

ADPs include businesses in each of the identified jurisdictions. They too allege that they indirectly purchased and received Bearings and vehicles containing Bearings. They allege they paid inflated prices. For example, EPPs allege that Defendants

26

entered into an unlawful agreement in restraint of trade in the District of Columbia.

They allege that the conspiracy restrained, suppressed, and eliminated price

competition relative to Bearings because the prices were fixed, thereby depriving

"Plaintiffs and members of the Damages Class" of free and open competition.  (Doc. No.

70 at ¶ 216(a)).  They also allege the illegal conduct "substantially affected" commerce

in the District.  Id.  ADPs allege the same (Doc. No. 67 at ¶ 283(a)), and that one of the

plaintiffs purchased and received vehicles and Bearings in the District of Columbia.

(Doc. No. 67 at ¶ 26).   These types of allegations are sufficient to state a claim under

the District of Columbia.  See  Sun Dun, Inc. of Washington v. Coca-Cola Co., 740 F.

Supp. 381, 397 (D. Md. 1990) (allowing discovery to ascertain whether an interstate link

could be established even though none of the defendants, nor the plaintiff were

residents or citizens of the District of Columbia).

Case law supports the sufficiency of the nexus stated in IPPs' antitrust claim

under Mississippi law inasmuch as three Mississippi residents are alleged to have

purchased Bearings in Mississippi indirectly from one or more Defendant, (Doc. No. 70

at ¶¶ 40-42), and four businesses in Mississippi allege that they purchased and

received Bearings and vehicles containing Bearings at inflated prices, in Mississippi,

and displayed, sold, serviced, and advertised their vehicles in Mississippi during the

Class Period.  (Doc. No. 67 at ¶¶ 27-28, 91-92, 101-104).  IPPs allege that the prices of

Bearings "were raised, fixed, maintained, and stabilized at artificially high levels through

Mississippi," and, that the competition for prices of Bearings was "restrained,

suppressed, and eliminated throughout Mississippi."  (Doc. No. 67 at ¶ 291, Doc. No. 70

at ¶ 222).  See In re GPU II, 540 F. Supp. 2d at 1099 (holding that allegations that the

27

defendants' conspiracy affected commerce within Mississippi satisfied requirement that the majority of an antitrust conspiracy occur within the state) (citing Standard Oil Co. of Kentucky v. State, 107 Miss. 377, 65 So. 468, 471 (1914) (the defendants sold and distributed products in Mississippi), overruled in part on other grounds sub nom. Mladinich v. Kohn, 250 Miss. 138, 164 So.2d 785 (1964)); California v. Infineon Techs. AG., 531 F. Supp. 2d 1124, 1158-1159 (N.D. Cal. 2007) (observing that the Mississippi Antitrust Act should be construed to require allegations of at least some activity or conduct occurring in intrastate commerce or trade).

The same factual allegations are advanced by Nevada residents: they purchased Bearings indirectly from one or more of the Defendants, at inflated prices, in Nevada because of Defendants' conspiracy.  (Doc. No. 67 at ¶¶ 67-68, 293; Doc. No. 70 at ¶¶ 48, 224).  ADPs also allege that they advertised, sold and serviced vehicles in Nevada during the Class Period.  (Id.)  The allegations meet the pleading requirements relative to Nev. Rev. Stat. Ann. § 598A.060(1), which prohibits conduct that is part of a conspiracy in restraint of trade in Nevada.  See In re Flat Panel, 599 F. Supp. 2d at 1189 (finding similar allegations sufficient to state a claim under the Nevada statute).

Defendants next contend that the antitrust claims under New York law fail because IPPs have not alleged a sufficient impact on intrastate commerce.  Again, EPPs allege that Defendants raised and maintained Bearings prices throughout New York, depriving IPPs of free and open competition, and causing EPPs to pay artificially inflated prices.  (Doc. No. 67 at ¶¶ 35-36, 93, 94, 296(a)-(c), 316(a)-(i); Doc. No. 70 at ¶¶ 51-52, 227(a)-(c), 251(a)-(e)).  The allegations advanced by IPPs differ from those found lacking and insufficient under New York law because IPPs have alleged that they

28

paid artificially high prices in New York.  See H-Quotient, Inc. v. Knight Trading Grp., Inc., 03 CIV. 5889 (DAB), 2005 WL 323750 (S.D.N.Y. Feb. 9, 2005) (the plaintiff included no allegations of intrastate conduct or that New York's local interests were affected by the challenged conduct).

The allegations likewise satisfy South Dakota's antitrust statute, S.D. Codified Laws § 37-1-3.1, which reads: "a contract, combination or conspiracy between two or more persons in restraint of trade or commerce any part of which is within this state is unlawful."  IPPs have alleged they purchased price-fixed products that entered the state.  IPPs allege that plaintiffs reside in South Dakota, and purchased Bearings, and ADPS allege they "purchased, displayed, sold, serviced and advertised vehicles in South Dakota during the Class Period."  (Doc. No. 67 at ¶¶ 87-88; Doc. No. 70 at ¶ 59). Independent Purchaser Plaintiffs allege the prices paid were supracompetitive, because they were fixed at artificially high levels throughout the state and had a substantial effect on South Dakota commerce.  (Doc. No. 67 at ¶ 300; Doc. No. 70 at ¶ 231).  The law does not require that Defendants sell the price-fixed products themselves in South Dakota, and these allegations satisfy the pleading standards. See In re GPU II  Antitrust Litig., 540 F. Supp. 2d at 1099.

The Tennessee state court, in Freeman Indus., LLC v. Eastman Chem. Co., 172 S.W.3d 512, 516 (Tenn. 2005), found a claim brought under Tennessee Code Annotated § 47-25-101 (2001), must meet the "substantial effects standard."  In contrast to the out-of-state plaintiff in Freeman Indus., who never alleged that it purchased the price-fixed product from a defendant with ties to Tennessee, here, in-state EPPs allege they purchased vehicles containing price-fixed products in Tennessee.  (Doc. No. 70 at

¶¶ 60, 232).  Accordingly, the Court rejects Collective Defendants' request for dismissal of this claim.

Lastly, the Court finds EPPs have stated a claim under West Virginia antitrust law, which "is directed towards intrastate commerce."  State ex rel. Palumbo v. Graley's Body Shop, Inc., 425 S.E.2d 177, 183 n.11 (W. Va. 1992) (citation omitted).  EPPs have alleged, albeit through inference, the purchase of Bearings in West Virginia. (Doc. No. 70 at ¶ 235).  EPPs allege an impact on intrastate commerce in that "price competition was restrained, suppressed, and eliminated throughout" the state.  (Doc. No. 70 at ¶ 222(a)).  They further allege that they paid "supracompetitive, artificially inflated prices" that had "a substantial effect on West Virginia commerce."  (Id.)  These allegations, read in the light most favorable to EPPs, demonstrate that once the price-fixed products entered the state's commerce, and were purchased by EPPs, an antitrust injury occurred.

In sum, the Court rejects Defendants' nexus argument.

### c.  Class Action

Defendants argue that the ADPs' claim on behalf of themselves and other similarly situated automotive dealers in Illinois must be dismissed.  This Court agrees, Illinois does not allow an indirect purchaser plaintiff to maintain an antitrust claim as a class action.  740 Ill. Comp. Stat. §10/7(2); In re Digital Music Antitrust Litig., 812 F. Supp. 2d 390, 415-16 (2011) (dismissing putative class action under Illinois antitrust law).  The Court agrees that Shady Grove Orthopedic Assoc. v. Allstate Ins. Co., 559 U.S. 393, 130 S.Ct. 1431, 1445 (2010) (holding that Rule 23 applies in federal court

unless it "abridge[s], enlarge[s] or modif[ies] any substantive right" under the Rules

Enabling Act, 28 U.S.C. §2072(b)) bars the claim.  Accord In re Digital Music Antitrust

Litig., 812 F. Supp. 2d 390, 416 (S.D. N.Y. 2011).  Accordingly, the Court dismisses

ADPs' antitrust claim under Illinois law.

### 2.  Consumer Protection Claims

In their consumer protection claims, IPPs seek relief under the laws of Arkansas,

California, Montana, New Mexico, New York, North Carolina, and South Carolina.

Defendants raise several arguments in support of dismissal, including failure to meet

particular pleadings standards, failure to allege a sufficient nexus between conduct and

commerce, failure to meet the definition of consumer, and state bars against class

actions.

### a.  Special Pleading Requirements

Defendants challenge IPPs' claims under the consumer protection statutes of

Arkansas, New Mexico, and New York based on their position that the claims fail to

include special pleading requirements.  The Court addressed these arguments in prior

component part cases, has reviewed the authority cited by the parties, and finds no

grounds for altering its prior analysis.

Under Arkansas law, the the Arkansas Deceptive Trade Practices Act ("ADTPA"),

Ark. Stat. Ann. § 4-88-107(a) (10), is construed liberally.  Curtis Lumber Co. v. La.

Pacific Corp., 618 F.3d 762, 780 (8th Cir. 2010).  See also In re Flash Memory Antitrust

Litig., 643 F. Supp. 2d 1133, 1156-57 (N.D. Cal. 2009).  Although Defendants contend

that price-fixing claims are not allowed under the ADTPA, many courts have allowed

31

such claim under the Act.  In re Aftermarket Filters Antitrust Litig., 08 C 4883, 2009 WL 3754041 (N.D. Ill. Nov. 5, 2009); In re: Chocolate, 602 F. Supp. 2d at 583 (N.D. Pa. 2009) (and cases cited therein). Accordingly, defendants' motion to dismiss plaintiffs' claims under the ADTPA is denied.

To support their claim under New Mexico's Unfair Practices Act, N.M. Rev. Stat. § 57-12-2. IPPs allege that the conspiracy resulted in artificially inflated price levels of Bearings, leading to a "gross disparity" between the value received by the New Mexico plaintiff and class and the prices paid for the Bearings. (Doc. No. 67 at ¶ 315; Doc. No. 70 at ¶ 250).   The allegations differ from those found lacking in GPU II, 527 F. Supp. 2d at 1029-30 (finding that unconscionability requires something more than merely alleging that the price of a product was unfairly high" and dismissing price fixing claim). See In re Chocolate, 602 F. Supp. 2d at 586; In re New Motor Vehicles, 350 F. Supp. 2d at 196. Accordingly, the allegations conform to the pleading requirements of Rule 12(b)(6).

This Court also rejects Defendants' contention that because IPPs included no allegation that they were aware of a defendant's deceptive acts, their claim is defective under New York law.  In the case before this Court, the anticompetitive conduct is "imbued with a degree of subterfuge," which is sufficient to sustain a claim under New York law.  See Leider v. Ralfe, 387 F.Supp.2d 283, 296 (S.D.N.Y.2005) (rejecting a § 349 claim where the defendant's conduct was not secretive) (citations omitted).  IPPs have alleged that Defendants engaged in materially deceptive conduct because they have alleged Defendants took measures to conceal their price-fixing activities. (Doc. No. 67 at ¶¶ 252-56, 296, 316;Doc. No. 70 at ¶¶ 190-93, 227, 251).  Consequently, the § 349 claim is viable.  See In re Dynamic Random Access Memory (DRAM) Antitrust

Litig., 536 F.Supp.2d 1129, 1143-44 (N.D. Cal. 2008); In re GPU II, 527 F. Supp. 2d at 1030.

### b.  Nexus between Conduct and Intrastate Commerce

Defendants challenge claims under the consumer protection laws of California, Montana, New York, and North Carolina because the complaints lack allegations that any of the offending conduct took place within the state or had an effect on intrastate commerce in these states.

Defendants' argument as to the viability of the consumer protection claim under California law rests on their position that EPPs do not allege any of the challenged conduct took place in the particular state.  The Court addressed the same argument in prior component part cases and concluded that IPPs had satisfied their pleading obligations, distinguishing Meridian Project Sys. Inc. v. Hardin Constr. Co., 404 F. Supp. 2d 1214, 1225 (E.D. Cal. 2005), because the plaintiff explicitly alleged that the misconduct occurred in Illinois, not California.  Under case law from California, "claims by nonCalifornia residents where none of the alleged misconduct or injuries occurred in California" do not state a claim.  See Norwest Mortgage, Inc. v. Superior Court, 85 Cal.Rptr.2d 18 (Cal. Ct. App. 1999).  Here, EPPs allege that California residents purchased Bearings indirectly from one or more Defendants at artificially inflated prices. (Doc. No. 70 at ¶¶ 8, 19-20, 200, 202, 204-05, 215(d), 242(e)).  The Court finds these allegations are sufficient.

Defendants advance the same challenge to EPPs' claim under Montana's Unfair

Trade Practices Act ("MUTPA"), Mont. Code Ann. § 30-14--101 et seq. This Court previously rejected this argument, observing that where plaintiffs have alleged their purchased vehicles containing the component part in states permitting recovery of damages by indirect purchasers. Collective Defendants' reliance on In re DRAM I, 516 F. Supp. 2d at 1104, is misplaced. EPPs alleged that price competition was restrained in Montana. (Doc. No. 70 at ¶ 207(a)). EPPs have alleged that Defendants' conduct was directed at the automotive parts market in all states, including Montana; that the conduct had the reasonably foreseeable effect of raising the price for finished products in all states, including Montana, and EPPs purchased price-fixed products in Montana, paying supracompetitive prices for those products. (Id.)

As for the sufficiency of the nexus relative to the New York claim, the Court again finds the pleadings are sufficient. Under New York General Business Law § 349 (1984), commercial misconduct occurring within New York is prohibited. To prevail on a claim under § 349, "a plaintiff must establish three elements: the challenged act or practice was consumer-oriented; it was misleading in a material way; and the plaintiff suffered injury as a result of the deceptive act." In re Flat Panel, 586 F. Supp. 2d at 1127. The shortcomings raised by Defendants with regard to EPPs' New York consumer protection claim have been addressed by this Court in prior component part cases. EPPs include two New York residents. As the Court previously stated, the allegations, read in the light most favorable to EPPs, suggests that the purchases took place in New York. EPPs allege Defendants engaged in deceptive commercial misconduct regarding the "prices at which Bearings were sold, distributed or obtained in New York." (Doc. No. 70 at ¶ 251(a)). The allegations describe conduct occurring in New York.

34

The North Carolina Unfair Trade Practices Act ("NCUTPA"), N.C. Gen. Stat. § 75-1.1, contains broad-sweeping language that declares unlawful, "Unfair methods of competition in or affecting commerce, and unfair or deceptive acts or practices in or affecting commerce." Under the statute, a "conspiracy in restraint of trade or commerce in the state of North Carolina is hereby declared to be illegal." Id. To bring a claim under the North Carolina Unfair Trade Practices Act ("NCUTPA"), a plaintiff must allege that the defendants' conduct had a substantial effect on in-state business. Merk & Co. v. Lyon, 941 F. Supp. 1443, 1463 (M.D. N.C. 1996). Accord Duke Energy Int'l, LLC v. Napoli, 748 F. Supp. 2d 656, 677 (S.D. Tex. 2010) (holding that "[a] plaintiff who does not allege a substantial effect on in-state North Carolina operations fails to state a claim under the NCUTPA"). Defendants argue that no claim is stated because the IPPs' complaints address nationwide effects that impact North Carolina no more than any other state. The Court disagrees. The cases upon which Defendants rely merely articulate the constitutional limitation of the NDCDTPA. IPPs allege that North Carolina IPPs were harmed by paying supracompetitive, artificially inflated prices" for Bearings. (Doc. No. 67 at ¶¶63-64; Doc. No. 70 at ¶ 252(d)). These allegations demonstrate that the application of North Carolina law is "neither arbitrary or unfair.." Duke Energy, 748 F. Supp. 2d at 677. Therefore, the Court denies Defendants' request for dismissal on this basis. Accord In re Flonase Antitrust Litig., ("In re Flonase II") 692 F. Supp. 2d 524, 540-41 (E.D. Pa. 2010) (considering whether allegations that large amounts of product sold in North Carolina at artificially inflated prices satisfied the substantial in-state effect required by the statute).

In sum, the Court denies Defendants' request for dismissal of the consumer

protection claims on the sufficiency of the nexus between Defendants' conduct and intrastate commerce. These allegations satisfy the pleading burden.

### c. Protection of Businesses

"The purpose of the District of Columbia's consumer protection statute is not protection of "merchants in their commercial dealings with suppliers or other merchants." Ford v. ChartOne, Inc., 908 A.2d 72, 83-84 (D.C. 2006) (observing that the District of Columbia Consumer Protection Procedures Act polices conduct arising out of a consumer-merchant dispute). Accord Dist. Cablevision Ltd. P'ship v. Bassin, 828 A.2d 714, 717 (D.C. 2003). ADPs do not oppose dismissal of their consumer protection claim under D.C. law. Accordingly, it is dismissed.

### d. Class Action Bar

Defendants assert that Auto Dealer Plaintiffs are barred from bringing their consumer protection claims under South Carolina law because it prohibits class actions. See South Carolina Unfair Trade Practices Act (SCUTPA"), S.C. Code § 39-5-140(a). The Court was persuaded in prior component part cases that Defendants are correct. See Stalvey v. American Bank Holdings, Inc., No. 4:13-cv-714, 2013 WL 6019320 at *4 (D. S.C., Nov. 13, 2013) (distinguishing Shady Grove and holding that the text of the SCUTPA that prohibits class actions, is part of the "substantive portions of South Carolina law and [is] not trumped by Federal Rule of Civil Procedure 23, even in light of the Shady Grove decision"). See also In re MI Windows and Doors, Inc. Products Liability Litig., No. 2:11–cv–00167–DCN, 2012 WL 5408563 (D. S.C. Nov. 6, 2012).

Defendants argue that EPPs cannot maintain their consumer protection claims

as a class action under Montana law.  In <u>Shady Grove Orthopedic Assoc. v. Allstate Ins. Co.</u>, 559 U.S. 393 (2010), the Supreme Court held that Rule 23 applies in federal court unless it "abridge[s], enlarge[s] or modif[ies] any substantive right" under the Rules Enabling Act, 28 U.S.C. § 2072(b).  A federal rule "cannot govern a particular case in which the rule would displace a state right or remedy that is procedural in the ordinary sense of the term but is so intertwined with a state right or remedy that it functions to define the scope of the state-created right."  <u>Id.</u>  Although the decision in <u>In re Packaged Ice Antitrust Litig.</u>, 779 F. Supp. 2d 642, 661 (E.D. Mich. 2011), included a footnote suggesting that a class action under the Montana consumer protection statute would be barred in federal court, the Montana statute addresses class actions only in the context of the procedures available to enforce the right in state court.  Mont. Code §30-14-133. As the Court held previously, the prohibition does not alter the substantive scope of the right to relief, and in the absence of governing authority to the contrary, the Court declines to dismiss on this ground.

### 3.  Unjust Enrichment Claims

Defendants challenge IPPs' unjust enrichment claims on four grounds. According to Defendants, the state unjust enrichment claims must be dismissed because Defendants gave consideration, because IPPs did not confer a benefit directly on Defendants, because IPPs voluntarily entered into purchasing arrangements for Bearings or vehicles containing Bearings and received the benefit of their bargains, and because IPPs failed to meet special pleading requirements in certain states.

Before turning its attention to the specific arguments, the Court recognizes that

37

although the particular elements of unjust enrichment vary from jurisdiction to jurisdiction, when stripped to its essence, a claim of unjust enrichment requires IPPs to allege sufficient facts to show that Defendants received a benefit, and under the circumstances of the case, retention of the benefit would be unjust.  See In re Flonase II, 692 F. Supp. 2d at 54 (holding that a claim of unjust enrichment requires a plaintiff to plead two elements: "receipt of a benefit and unjust retention of the benefit at the expense of another").  In support of their unjust enrichment claims, IPPs allege that as a result of the challenged conduct, "Defendants have been unjustly enriched by the receipt of, at a minimum, unlawfully inflated prices and unlawful profits" from the sales of Bearings, that "Defendants have benefitted from their unlawful acts," and that "it would be inequitable for Defendants to be permitted to retain any of the 'ill-gotten gains' resulting from the overpayments."  (Doc. No. 67 at ¶¶ 322-323; Doc. No. 70 at ¶¶ 356-57).

Although the Court agrees that these particular allegations are conclusory, the Court does not read these allegations in isolation, but in light of all of the factual allegations in the complaints.  An unjust enrichment claim is used to prevent a defendant from "profit[ing] by his own wrong."  Restatement (Third) of Restitution & Unjust Enrichment § 3.  Here, IPPs allege that Defendants profited from their antitrust conspiracy.  The Court has addressed the arguments advanced here in other component part cases and, after reviewing the cases, finds no basis for altering its analysis.   Therefore, the Court dismisses IPPs' claim of unjust enrichment under California law, as it does not recognize a cause of action for unjust enrichment.  See Hill v. Roll Int'l Corp., 195 Cal. App. 4th 1295, 1307, 128 Cal. Rptr. 3d 109 (2011); Levine v.

38

Blue Shield of Cal., 189 Cal. App. 4th 1117, 1138, 117 Cal. Rptr. 3d 262 (2010).  Accord

Fraley v. Facebook, 830 F. Supp. 2d 785, 814 (N.D. Cal. 2011).  For the reasons that

follow, the Court declines to dismiss any of the other unjust enrichment claims.

### a. Consideration

Defendants argue that their retention of the payment is not unjust given the

consideration they have provided.  There is no dispute that Defendants gave Bearings

to their direct customers.  Nevertheless, the Court disagrees with Defendants that the

exchange of Bearings for payment bars IPPs' unjust enrichment claims.  The issue is

whether the transaction was unjust.  IPPs allege that they overpaid for Bearings

because Defendants fixed the prices of Bearings.  The facts alleged in their complaints

meet their pleading burden, see In re K-Dur Antitrust Litig., 338 F. Supp. 2d 517, 545

(D.N.J. 2004) (the exchange of "any consideration" does not bar recovery under an

unjust enrichment theory), inasmuch as the allegations create an inference that the

consideration was not reasonable, valuable, or adequate.  Defendants have failed to

cite a single case finding that payment or receipt of anything of value from a defendant

will defeat a plaintiff's claims for unjust enrichment.  "Determinations that depend on

evaluating whether a benefit received approximates the value paid are primarily

questions of fact, and as such, are not appropriately addressed on a motion to dismiss."

Id. at 546.

Moreover, the Court finds the cases upon which Defendants' rely are not

persuasive for either of two reasons.  First, they address consideration in the context of

general contractor/subcontractor relationships and cannot be read to cover the price-

39

fixing claims advanced here.  Accordingly, the Court rejects the request for dismissal of all the unjust enrichment claims of Kansas, Massachusetts, Missouri, Nevada, New Hampshire, South Dakota, Tennessee, Utah, Vermont, and Wisconsin on the ground that Defendants gave consideration.  See e.g. Tradesmen Int'l, Inc. v. United States Postal Serv., 234 F. Supp. 2d 1191, 1205 (D. Kan. 2002) (principles preventing a subcontractor from recovering against a property owner in unjust enrichment are equally applicable to a sub-subcontractor's claim of unjust enrichment against the general contractor); County Asphalt Paving Co., Inc. v. Mosley Const., Inc., 239 S.W.3d 704 (Mo. Ct. App. 2007) (holding that an owner cannot be unjustly enriched by retaining the benefits of work performed by subcontractors where the owner has paid the general contractor in full); Browyer v. Davidson, 584 P.2d 686, 687 (Nev. 1978) (subcontractor's failure to enforce his lien rights precluded his claim that the defendant was unjustly enriched by the benefits retained); Mangiardi Bros. Trucking, Inc. v. Dewey Envtl., LLC, 12-CV-481-JD, 2013 WL 1856338 (D. N.H. Apr. 30, 2013) (observing that although it is unfair that contractors were not fully compensated for their services, it is equally unfair that a party which did not receive a benefit should have to pick up the slack); Paschall's, Inc. v. Dozier, 407 S.W.2d 150 (Tenn. 1966) (action against homeowners for materials and labor furnished in construction of bathroom addition to house); Concrete Prods. Co., a Div. of Gibbons & Reed v. Salt Lake Cnty., 734 P.2d 910, 911 (Utah 1987) (holding that the defendant county had not been unjustly enriched by the plaintiff's delivery of concrete for curbs and gutters to a third-party who never paid); Ray Reilly's Tire Mart, Inc. v. F.P. Elnicki, Inc., 537 A.2d 994, 995 (Vt. 1987) (citing Morrisville Lumber Co., Inc. v. Okcuoglu, 531 A.2d 887, 889 (Vt. 1987) (holding that "retention of a

benefit is not unjust" where owner did not accept material or deal directly with the subcontractor); Tri-State Mech., Inc. v. Northland Coll., 681 N.W.2d 302, 305-06 (Wisc. Ct. App. 2004) (observing that the plaintiff could not recover under a theory of unjust enrichment where an unpaid subcontractor brought claim against the owner that has received the benefits, but has already paid for the benefits conferred).

Second, the unjust enrichment claims that failed in the cases upon which Defendants' rely are factually inapposite.  Because the essence of an unjust enrichment case turns on the facts, the Court cannot extend the facts of a claim turning on the terms of a contract or the liability of a principal for its agent to the price-fixing claims advanced here.  See Ferola v. Allstate Life Ins. Co., 050996, 2007 WL 2705534 (Mass. Super. Aug. 30, 2007) (executor cannot recover because decedent purchased annuity and received benefits under the contract); Parker v. West Dakota Insurers, Inc., 605 N.W. 2d 181, 187 (S.D. 2000) (rejecting former employee's unjust enrichment claim to collect post-employment renewal commissions from her employer--a contractually based argument for unjust enrichment); American Movie Classics v. Rainbow Media Holdings, 508 F. App'x 826 (10th Cir. 2013) (rejecting an unjust enrichment claim under Utah law against the principal where agent was paid in full).  Accordingly, the Court denies Defendants' request to dismiss the unjust enrichment claims on the basis of consideration.

### b.  Direct Benefit

In the alternative, Defendants assert that IPPs' claims under Arizona, Florida,

41

Iowa, Kansas, Michigan, Minnesota, New York, North Carolina, North Dakota, Rhode Island, South Carolina, Utah, and the District of Columbia fail because a plaintiff must allege that it directly conferred some advantage on the defendant.  In re Aftermarket Filters Antitrust Litig., No. 08 C 4883, 2010 WL 1416259 at *2-3 (N.D. Ill. Apr. 1, 2010).  Here, as indirect purchasers, any benefit conferred by the IPPs was to others in the chain of distribution, not Defendants, and the parties dispute whether the lack of direct contact dooms the unjust enrichment claims.  The Court holds that it does not.  The "critical inquiry [i]s not whether the benefit is conferred directly on the defendant, but whether the plaintiff can establish the relationship between his detriment and the defendant's benefit 'flow from the challenged conduct."  In re Cardizem CD Antitrust Litig., 105 F. Supp. 2d 618, 669 (E.D. Mich. 2000) (Edmunds, J.).  See e.g. Yee v. Nat'l Gypsum Co., CV-09-8189-PHX-DGC, 2010 WL 2572976 (D. Ariz. June 22, 2010) (involving a proposed class action arising out of the manufacture and sale of allegedly defective drywall, wherein the plaintiff alleged only that he paid the purchase price for the drywall, and not that he conferred a benefit on the manufacturer); In re Porsche Cars N. Am., Inc., 880 F. Supp. 2d 801, 843 (S.D. Ohio 2012) (dismissing an unjust enrichment claim arising out of a Florida plaintiff's purchase of a vehicle containing defective coolant tubes because there was no direct link to the manufacturer); In re Processed Eggs, 851 F. Supp. 2d at 929 (Florida courts require "some benefit" to flow to the defendant, it finds no requirement that the benefit be bestowed through direct contact); Romano v. Motorola, Inc., No. 07-CIV-60517, 2007 WL 4199781 at *2 (S.D. Fla. Nov. 26, 2007) (refusing to dismiss a claim of unjust enrichment even though the plaintiff purchased a product through a manufacturer's "retail outfit" because the

42

defendant still directly benefitted through profits arising out of the sale); Sheet Metal Workers Local 441 Health & Welfare Plan v. GlaxoSmithKline, PLC, 737 F. Supp. 2d 380, 434 (E.D. Pa. 2010) (rejecting claim that the antitrust injury suffered by Iowa plaintiffs was too remote); Commercial Fed. Bank v. Qwest Corp., 695 N.W.2d 41 (Iowa Ct. App. 2004) (subcontractors seeking unjust enrichment claim against owner); In re Processed Eggs, 851 F. Supp. 2d at 929-930 (no requirement under Kansas law that the benefit flow directly from the plaintiff to the defendants, and acknowledging that courts have upheld unjust enrichment claims brought by indirect purchasers of price-fixed parts); In re Static Random Access Memory (SRAM) Antitrust Litig., 07-MD-01819 CW, 2010 WL 5094289 at *7 (N.D. Cal. Dec. 8, 2010) (Michigan law does not require a benefit to be conferred directly by plaintiff to a defendant) (citing Kammer Asphalt Paving Co., Inc. v. East China Township Schools, 443 Mich. 176, 187-88, 504 N.W.2d 635 (1993)); Morris Pumps v. Centerline Piping, Inc., 729 N.W.2d 898 (Mich. Ct. App. 2006); In re Cardizem CD Antitrust Litig., 105 F. Supp. 2d 618, 670-71 (E.D. Mich. 2008); Schumacher v. Schumacher, 627 N.W.2d 725, 729 (Minn. Ct. App. 2001) (remanding dismissal of claim for unjust enrichment for consideration of whether the defendants benefitted by illegal or unlawful conduct); Sperry v. Crompton Corp., 26 A.D.3d 488, 810 N.Y.S.2d 498, 499-500 (N.Y. App. Div. 2006) (affirming the dismissal of an unjust enrichment claim brought by New York indirect purchasers because the alleged connection between plaintiffs and defendants was simply too attenuated, but observing "a plaintiff need not be in privity with the defendant to state a claim for unjust enrichment"); Baker Constr. Co. v. City of Burlington, No. COA09-13, 2009 WL 3350747, at *1 (N.C.App. Oct. 20, 2009) (rejecting a claim by the plaintiff construction

43

company against the subsequent owner of the property, noting that "[w]here a third person benefits from a contract entered into between two other persons[,] the mere failure of performance by one of the contracting parties does not give rise to a right of restitution against the third person"); Opp v. Matzke, 559 N.W.2d 837, 839-40 (N.D. 1997) (no direct benefit requirement); In re TFT-LCD (Flat Panel) Antitrust Litig., M 07-1827 SI, 2011 WL 4501223 (N.D. Cal. Sept. 28, 2011) (declining to dismiss unjust enrichment claim under Rhode Island law on the defendant's direct benefit argument); Myrtle Beach Hosp., Inc. v. City of Myrtle Beach, 341 S.C. 1, 3, 532 S.E.2d 868, 869, 873 (2000) (rejecting unjust enrichment claim where benefit to defendant was "incidental"); Rawlings v. Rawlings, 240 P.3d 754, 761 (Utah 2010) (recognizing the flexible nature of the claim); In re Processed Eggs, 851 F. Supp. 2d at 934 (no requirement of direct benefit to defendant under Utah law); Minebeaq Co. Ltd. v. Pabst, 444 F. Supp. 2d 168, 186 (D.C. 2006) (involving payment for a patent by joint venture partner); In re (Flat Panel), 2011 WL 4501223 at * 12 (rejecting argument that "the District of Columbia requires a 'direct relationship' between an unjust enrichment plaintiff and the defendant").

### c. Benefit of the Bargain

Defendants also assert that IPPs' unjust enrichment claims fail because IPPs entered into a voluntary agreement and received the benefit of their respective bargains.   Defendants challenge claims brought under the laws of Arizona, Arkansas, District of Columbia, Florida, Illinois, Iowa, Massachusetts, Michigan, Minnesota, Missouri, Nebraska, New Hampshire, New Mexico, New York, North Carolina, North Dakota, Oregon, Rhode Island, South Carolina, and Utah as subject to dismissal on this

44

ground.  The Court has reviewed the case law cited by Defendants and finds that the authority does not support dismissal of a price-fixing claim on this basis–the cases do not stand for the proposition that a plaintiff must allege that he dealt directly with the defendants.  Specifically, IPPs had no contractual relationship with Defendants, a fact that distinguishes IPPs' unjust enrichment claims from the cases cited by Defendants. See e.g. USLife Title Co. of Ariz. v. Gutkin, 732 P.2d 579, 585 (Ariz. Ct. App. 1986) (rejecting the plaintiff's unjust enrichment claim where the plaintiff had already received the quitclaim deed for which it had bargained); Frein v. Windsor Weeping Mary LP, 366 S.W.3d 367, 372 (Ark. Cr. App. 2009) (observing that "the concept of unjust enrichment has no application when an express written contract exists"); Fort Lincoln Civic Ass'n, Inc. v. Fort Lincoln New Town Corp., 944 A.2d 1055, 1076 (D.C. 2008) (dismissing an unjust enrichment claim because it advanced the same theory behind a breach of contract claim); Prohias v. Pfizer, Inc., 485 F. Supp. 2d 1329, 1336 (S.D. Fla. 2007) (rejecting the plaintiffs' unjust enrichment claim involving deceptive advertising of a drug because the plaintiffs continued to pay for the drug even after they had "knowledge as to its alleged limitations," thus they were not "actually injured or aggrieved by the allegedly misleading advertisement"); La Throp v. Bell Fed. Sav. & Loan Ass'n, 370 N.E.2d 188, 195 (Ill. 1977) (rejecting the plaintiffs' unjust enrichment claim that the defendant should pay interest on impoundment funds, observing that "the absence of a provision to pay interest on the impoundment funds is equivalent to an agreement that it should not be paid"); Smith v. Stowell, 125 N.W.2d 795, 800 (Iowa 1964) (express written agreement covered the subject matter of the dispute); Ferola v. Allstate Life Ins. Co., 050996, 2007 WL 2705534 (Mass. Super. Aug. 30, 2007) (when claim arises in

45

"the context of a contract, in order for defendant's retention of money received to be

unfair, the plaintiff must allege that consideration failed"); Isom v. NE Lots LLC, No.

288378 (Mich. Ct. App. Jan. 14, 2010) (a party cannot use unjust enrichment to alter the

terms of a contract); Zinter v. Univ. of Minnesota, 799 N.W.2d 243, 247 (Minn. Ct. App.

2011) (no claim where  contract covered the parties' relationship); Am. Standard Ins.

Co. of Wisconsin v. Bracht, 103 S.W.3d 281, 293 (Mo. App. S.D. 2003) (when an

express contract governs the subject matter, a claim of unjust enrichment does not

apply); Farmers New World Life Ins. Co. v. Jolley, 747 S.W.2d 704, 707-08 (Mo. App.

W.D. 1988) (holding that plaintiff's entering into an agreement with known risks

precluded recovery under an unjust enrichment claim when an anticipated contingency

occurred); Washa v. Miller, 546 N.W.2d 814, 819 (Neb. 1996) ("unjust enrichment is

recognized only in the absence of an agreement between the parties"); Clapp v.

Goffstown Sch. Dist., 977 A.2d 1021, 1025 (N.H. 2009) (citing 42 C.J.S. Implied

Contracts § 38 (2007) (noting that "unjust enrichment. . .is not a means for shifting the

risk one has assumed under contract"); Arena Res., Inc. v. Obo, Inc., 238 P.3d 357, 361

(N.M. Ct. App. 2010) (rejecting unjust enrichment claim, noting that, in general, a

contract had to be enforced as written absent "fraud, real hardship, oppression, mistake,

unconscionable results, and the other grounds of righteousness, justice and morality");

Vitale v. Steinberg, 307 A.D.2d 107, 111, 764 N.Y.S.2d 236 (2003) (in New York, the

state courts reject claims for unjust enrichment when express contracts govern the

same subject matter); Britt v. Britt, 359 S.E.2d 467, 470 (N.C. 1987) (the parties'

agreement governs whether a defendant was unjustly enriched); Jerry Harmon Motors,

Inc. v. Heth, 316 N.W.2d 324, 328 (N.D. 1982) ("a person is not unjustly enriched by

46

retaining benefits involuntarily acquired which law and equity give him absolutely without any obligation on his part to make restitution") (citation omitted); High v. Davis, 584 P.2d 725, 736 (Or. 1978) (observing that a quitclaim deed establishes the parties' agreement in a property transaction, and the purchaser assumes the risk of defective title); Doe v. Burkland, 808 A.2d 1090, 1095 (R.I. 2002) (reinstating unjust enrichment counterclaim as well as others dismissed by the lower court because it ignored the allegation that valid consideration provided for the property-sharing agreement) (citing Rhode Island Hosp. Trust Co. v. The Rhode Island Covering Co., 190 A.2d 219 (R.I. 1963)); Johnston v. Brown, 357 S.E. 2d 450, 452 (S.C. 1987) (reversing dismissal of unjust enrichment claim in light of evidence of lack of an agreement); S. Title Guar. Co., Inc. v. Bethers, 761 P.2d 951, 955 (Utah Ct. App. 1988) (citation omitted) (when a plaintiff enters into a "transaction at arm's length and the plaintiff received what he bargained for" he cannot bring a claim for unjust enrichment).

The Court finds the case law is not applicable to the facts before it.  In contrast to the relationships involved in the case law cited by Defendants, here the parties were not in a direct bargaining relationship.  Instead, IPPs' unjust enrichment claims arise out of the alleged antitrust violations that resulted in payment of overcharges by IPPs. Further, IPPs allege that they had no knowledge of the antitrust conspiracy, they were not in a contractual relationship with Defendants, and, consequently, the Court denies Defendants' request for dismissal.

### d.  Special Pleading Requirements

47

Lastly, Defendants argue that Arizona, Hawaii, Illinois, Massachusetts, Minnesota, Mississippi, North Dakota, South Carolina, Tennessee, Utah, and West Virginia have special pleading requirements that render the complaints inadequate.

According to Defendants, certain states require a plaintiff bringing an unjust enrichment claim to plead the absence of a legal remedy, or exhaustion of legal remedies, or, in some states, a duty or a mistake of fact.  None of the cases cited by Defendants to support their position is persuasive because the cases can be distinguished factually or by procedural stage in which the decision was rendered.  See e.g. In re Digital Music Antitrust Litig., 812 F. Supp. 2d 390, 412 (S.D.N.Y. 2011) (citing In re Flonase II, 692 F. Supp. 2d at 543 (denying a motion to dismiss an unjust enrichment claim under Arizona law because the plaintiffs could plead alternative remedies at the pleading stage)); In re Horizon Organic Milk Plus DHA Omega-3 Mktg. & Sales Practice Litig., 955 F. Supp. 2d 1311, 1337 (S.D. Fla. 2013) ("although most equitable remedies are not available under Florida law when adequate legal remedies exist, the rule does not apply to claims of unjust enrichment"); Porter v. Hu, 169 P.3d 994, 1007 (Haw. Ct. App. 2007) (appeal of a jury verdict, not a decision about the sufficiency of the pleadings); Davis v. Four Seasons Hotel Ltd., CIV. 08-00525 HG-BMK, 2011 WL 5025521 (D. Haw. Oct. 20, 2011) (same); Martis v. Grinnell Mut. Reinsurance Co., 905 N.E.2d 920, 928 (Ill. Ct. App. 2009) (observing that "[w]hen an underlying claim of fraud, duress or undue influence is deficient, a claim for unjust enrichment should also be dismissed"); Fernandes v. Havkin, 731 F. Supp. 2d 103, 114 (D. Mass. 2010) (assessing merits of summary judgment of an unjust enrichment claim arising out of a mortgage contract and acknowledging other decisions on summary

48

judgment holding that the "mere availability" of an adequate remedy at law is a bar to a claim of unjust enrichment"); Southtown Plumbing, Inc. v. Har-Ned Lumber Co., Inc., 493 N.W.2d 137, 140 (Minn. Ct. App. 1992) (involving appeal of direct verdict in favor of defendants because plaintiffs failed to pursue their legal remedy under the mechanic's lien statute); Willis v. Rehab Solutions, PLLC, 82 So. 3d 583, 588 (Miss. 2012) (appealing a jury verdict, arguing that unjust enrichment was not the proper measure of damages); Apache Corp. v. MDU Res. Grp., Inc., 603 N.W.2d 891, 895-96 (N.D. 1999) (assessing the merits of an unjust enrichment claim relative to a third-party beneficiary's entitlement to enforce the defendant's contract after the defendant breached its contract, and concluding that the plaintiff's impoverishment resulted from a valid contractual arrangement so the result was not contrary to equity); Ellis v. Smith Grading & Paving, Inc., 294 S.C. 470, 366 S.E.2d 12, 15 (S.C. Ct. App.1988) (outlining elements of claim, with no reference to a requirement to allege the existence of a duty); Freement Indus. LLC v. Eastman Chem Co., 172 S.W.3d 512, 526 (Tenn. 2005) ("a plaintiff is not required to exhaust all remedies against the party with whom the plaintiff is in privity if the pursuit of the remedies would be futile"); In re (Flat Panel) Antitrust Litig., 599 F. Supp. 2d at 1192-93 (denying the futility exception in a case involving Tennessee indirect purchasers, advancing a price-fixing claim against the defendant-manufacturers, where there were no allegations that resellers were involved in the conspiracy because futility was "self-evident"); Nickerson Co. v. Energy W. Mining Co., No. 20090221-CA- 2009 WL 4681778 at *2 (Utah Ct. App. Dec. 10, 2009) (addressing summary judgment argument that "one must first exhaust his legal remedies before he may recover on the basis of the equitable doctrine of quantum meruit"); Wittenberg v.

49

First Indep. Mortg. Co., No. 3:10-CV-58, 2011 WL 1357483 at *15 (N.D. W.Va. Apr. 11, 2011) (dismissing the plaintiff's unjust enrichment claim because the conduct at issue–the securitization of the plaintiff's loan–was neither unlawful nor unauthorized).

In sum, the Court has reviewed the case law upon which Defendants' rely and in large measure finds it distinguishable.  For the most part, the state cases cited by Defendants did not involve indirect purchasers of price-fixed products.  IPPs have alleged a lengthy conspiracy by Defendants to fix the prices of IPCs.  The allegations, viewed in the light most favorable to IPPs, satisfy their burden to advance claims of unjust enrichment.

With the exception of California, which does not recognize a claim of unjust enrichment, the allegations in the complaints before the Court create a reasonable inference of unjustness regardless of the particularities of any state law.

### F.  Injunctive Relief

Indirect Purchaser Plaintiffs ask the Court for an injunction "preventing and restraining the violations alleged" in their complaints.  (Doc. No. 67 at ¶ 274; Doc. No. 70 at ¶ 207).  The request is authorized under the Clayton Act, which provides that "[a]ny person, firm, corporation, or association shall be entitled to sue for and have injunctive relief, in any court of the United States having jurisdiction over the parties, against threatened loss or damage by a violation of the antitrust laws."  15 U.S.C. § 26.

In challenging the request, Defendants argue that the complaints lack the factual support necessary to establish a real or immediate threat of future harm.  Specifically, Defendants contend that the relief is undermined by the guilty pleas, the overseas investigations and enforcement actions, and the public statements by Defendants

50

acknowledging the DOJ investigation.  Further, Defendants contend that there has been no unlawful conduct alleged after 2011.

The Court finds the allegations in the respective complaints are sufficient, at this stage of the proceedings, to satisfy IPPs' burden to allege the existence of "some cognizable danger of recurrent violation."  United States v. W. T. Grant Co., 345 U.S. 629, 633 (1953).  The purpose of an injunction is to prevent future violations.  Swift & Co. v. United States, 276 U.S. 311, 326 (1928).  Speculation by  Defendants' that the orders, pleas, and publicity will prevent further misconduct fails to demonstrate the threat of future injury is implausible, particularly in light of the length of the conspiracy alleged and the market conditions.  This Court is not in a position to render an assessment that injunctive relief cannot be had at this stage of the proceedings. Accordingly, the  Defendants' request is denied.

## V.  CONCLUSION

For the reasons discussed above, the Court **GRANTS** in part and **DENIES** in part Defendants' motion.

ADPs' antitrust claims under Illinois are **DISMISSED**.  The applicable statutes of limitation limit damages under the laws of Utah and New Hampshire.  ADPs' South Carolina consumer protection class action is **BARRED,** ADPs' consumer protection claims under the District of Columbia is **DISMISSED**.

IPPs' unjust enrichment claim under California law is **DISMISSED**.

**IT IS SO ORDERED.**


Date:   September 25, 2014                                   s/Marianne O. Battani

MARIANNE O. BATTANI
United States District Judge

<u>CERTIFICATE OF SERVICE</u>

The undersigned certifies that the foregoing Order was served upon counsel of record via the Court's ECF System to their respective email addresses or First Class U.S. mail to the non-ECF participants on September 25, 2014.

s/ Kay Doaks
Case Manager